# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| **UNITED STATES OF AMERICA,**<br><br>Plaintiff,<br><br>v.<br><br>**EDDIE GUERRERO-NARVAEZ [1],**<br><br>Defendant. | CRIM. NO. 18-002 (PG) |

## **OPINION AND ORDER**

Before the Court is defendant Eddie Guerrero-Narvaez's ("Guerrero") motion for judgment of acquittal pursuant to Rule 29 of the Federal Rules of Criminal Procedure. See Docket No. 134. For the reasons detailed below, Guerrero's motion is **GRANTED**.

## I. **BACKGROUND**

On March 28, 2019, after a three-day trial, a jury found Guerrero and a co-defendant guilty of aiding and abetting a carjacking in violation of 18 U.S.C. §§ 2 and 2119. See Docket Nos. 111 and 112. Now, Guerrero moves the Court to set aside that verdict, arguing, *inter alia*, that the government presented insufficient evidence to establish that Guerrero harbored the *mens rea* required by § 2119 at the time of the charged carjacking. See Docket No. 134. See also 18 U.S.C. § 2119 ("Whoever, *with the intent to cause death or serious bodily harm* takes a motor vehicle…" (emphasis added)).

Guerrero concedes that, at around noon on January 3, 2018, he illegally took a grey 2001 BMW X5 Sports Utility Vehicle ("SUV") from victim Keysha Silva Rivera ("Silva") at a Puma gas station in the Los Angeles sector of Carolina, Puerto Rico. Notwithstanding, Guerrero posits the government did not prove beyond a reasonable doubt that he *intended to cause serious bodily harm or death* if necessary to take the SUV from Silva's possession. The government, in turn,

contends that Guerrero's intent can be inferred from five specific facts purportedly proven at trial, which the Court will discuss in detail later on.[1]

## II. STANDARD OF REVIEW

Pursuant to Rule 29 of the Federal Rules of Criminal Procedure, "[a] defendant may move for a judgment of acquittal, or renew such a motion, within 14 days after a guilty verdict or after the court discharges the jury, whichever is later." Fed. R. Crim. P. 29(c). In ruling on a motion under this rule, the court must view "the evidence in the light most flattering to the jury's guilty verdict, and assess whether a reasonable factfinder could have concluded that the defendant was guilty beyond a reasonable doubt." United States v. Lipscomb, 539 F.3d 32, 40 (1st Cir. 2008). In addition, the court will give "equal weight to direct and circumstantial evidence," United States v. Appolon, 715 F.3d 362, 367 (1st Cir. 2013), and cannot "assess the credibility of witnesses, as that is a role reserved for the jury." Lipscomb, 539 F.3d at 40 (quoting United States v. Trinidad-Acosta, 773 F.3d 298, 310-11 (1st Cir. 2014)). If, however, evidentiary conflicts, credibility questions or competing inferences (two or more of which are plausible) arise, the trial judge must resolve them in the prosecution's favor. See United States v. Olbres, 61 F.3d 967, 970 (1st Cir. 1995).

## III. THE EVIDENCE

Three evidentiary items will inform the Court's analysis: video recorded on the gas station's surveillance camera system, Silva's trial testimony, and an audio tape of Silva's 911 call.

### A. Surveillance Videos

On the second day of trial, the government introduced into evidence a handful of video recordings captured by the gas station's surveillance camera system. See Government's Exhibits 6, 7, 8, 9, and 10. The Court will focus on Exhibit 8, which shows the gas station's servicing area (where

---

[1] The Court must note, at the offset, that the government's argumentation on the issue of intent is scant and, ultimately, found wanting. The government fails to provide a single case supporting how the five factors detailed in its opposition can prop up a finding of intent. To boot, it devotes less than two pages to attempt to rebut Guerrero's extensive and well-developed arguments on the issue of intent. In the end, the government comes up well short of the end zone.

the charged carjacking took place), a large patch of asphalt next to that area, the entrance to the gas station's store, and the adjacent sidewalk.[2]

At the 11:22 mark of Exhibit 8 (12:12 p.m.), Silva's grey BMW SUV is parked at a gas pump, across from a red Volkswagen Beetle at the opposite gas pump. See Exhibit 8 at 11:22. The gas station stands on the corner of two perpendicular streets; a busy highway runs behind the gas station, parallel to one of the streets. Id. A large white cargo truck is parked in the asphalt patch next to the gas servicing area. Id. Guerrero, dressed all in red, begins approaching the SUV from the sidewalk adjacent to the store. Id. He reaches the driver's door as Silva opens it and begins to step out. See id. at 11:35. Just a second earlier, Guerrero and the red Volkswagen's owner walk past each other as the latter heads to the store. See id. at 11:34. Guerrero stands by the door, perhaps two or three feet away from Silva. See id. at 11:35. She rests a lone foot on the ground – the other remains inside the vehicle. Id. Guerrero talks to her for approximately 20 seconds. See id. at 11:35-11:55. His back and left side are to the camera while he talks to her – it cannot capture his front, right side, and face. Id. A man on a motorcycle speeds through the lane between the SUV and the red Volkswagen, no more than four feet from Guerrero and Silva. See id. at 11:46-11:48.

Silva steps out of the vehicle as Guerrero turns slightly to the right to allow her to pass. See id. at 11:57-11:59. There is enough space between Guerrero and the SUV for Silva to walk through unimpeded. Id. Guerrero stays put as Silva walks to the back door and opens it. See id. at 11:59-12:01. They talk. See id. at 12:02- 12:11. Silva's children – a girl and a boy – exit the vehicle and walk by their mother to the back of the SUV. See id. at 12:12 - 12:19. Silva also walks to the back of the SUV and opens the trunk. See id. at 12:21-12:28. Guerrero does not immediately follow. See id. at 12:21-25. When he does, he stands at the left edge of the trunk, with his left hand resting on top of the car. See id. at 12:25-32.[3]

---

[2] Exhibits 6, 7, 9 and 10 were recorded by different cameras that did not capture the taking of the SUV as clearly as Exhibit 8.

[3] While Guerrero and Silva are at the back of the SUV, two men wheel goods in a cart towards the store. See id. at 12:28-12:32. They stop at the door, look towards Guerrero and Silva, and enter the store.

Guerrero remains at the trunk's left edge while Silva removes items from within. See id. at 12:32-12:51. Guerrero reaches into the trunk and hands her an umbrella. See id. at 12:51-12:55. Silva walks along the right side of the SUV to the front passenger door and opens it. See id. at 12:59-13:06. Her torso appears to be in the vehicle at this point. Id. She leaves her kids standing behind the trunk of the SUV, where Guerrero loiters – next to them. See id. at 13:00-13:02. He then walks along the left side of the SUV, closes the back door, and clambers into the driver's seat. See id. at 13:03-13:12. Silva finishes rummaging inside the SUV, retreats, and closes the front passenger door. See id. at 13:12-13:17. Silva walks again to the back and makes to close the trunk door, but Guerrero accelerates before she can reach it. See id. at 13:18-13:24. The grey SUV, now driven by Guerrero, exits the gas station, rounds the corner, and speeds up the street and out of the video frame. 13:34-13:40. Silva tarries at the gas pump, speaking on her phone – vehicles enter and leave the gas station, people go about their business around her. See id. at 12:36-18:00. Silva and her children go into the gas station store. See id. at 18:01-18:20. The video ends. See id. at 19:10.

## B. Silva's Testimony

As its third witness, the government called Silva to the stand. She told the jury about the events leading up to the SUV's taking, the taking itself, and what she did afterwards. See Trial Transcript, Day 2, at 3-47. Silva made several apposite statements that are material to the inquiry at hand. According to her testimony:

As Guerrero approached her, Silva thought he was going to "offer [her] to serve gas." Id. at 19. However, when he reached her, Guerrero "block[ed] her in" and told her "he was sent to take the vehicle from her." Id. at 20. See also id. at 30 ("they had given him an order to take [her] vehicle."). Silva asked Guerrero if the taking of the SUV "had something to do with the previous owner of the vehicle," to see what he would tell her, because she "thought it was a prank." Id. at 22.

---

See id. at 12:32-12:34. The red Volkswagen's owner has now returned to his car; he starts filling his tank within earshot of Guerrero and Silva. See id. at 12:31. A man in a gray shirt walks towards the gas servicing area, lingers near the red Volkswagen, and rounds the gas pumps. See id. at 12:36-13:28.

See also id. at 28, 30. Guerrero told her "that if [she] cooperate[d], he [was] not going to harm either [her] nor [her] children." Id. at 20. He simultaneously touched his t-shirt, as if "making [Silva] understand that he was armed." Id. at 21. See also id. at 28, 46.

Silva felt intimidated. Id. At trial, she testified that Guerrero is "approximately" five feet and nine inches tall, whereas she stands at four feet and eleven inches. See id. At 20.

Silva asked Guerrero if he would allow her to let the children out of the SUV and to retrieve their property – and he acquiesced. Id. She removed items such as her purse, bookbags, documents and an umbrella from the vehicle. Id. at 32-35. Guerrero helped her remove her possessions from the SUV and did not rush her or threaten her as she did so. Id. at 23, 34. When asked, at trial, how close Guerrero was to her as she removed her property from the vehicle, Silva answered "close enough." Id. at 23. Silva searched the front passenger seat "to check that [she] didn't leave anything." Id. at 23, 35. While she was there, Guerrero climbed into the driver's seat, on the other side of the SUV, and asked her "how to push the seat back." Id.

Guerrero never touched Silva. See id. at 32. He did not show Silva, and she did not see, a gun or weapon of any kind. See id. at 33, 34.

Silva didn't run off in the SUV because she "was afraid that [Guerrero] was armed and that he would shoot [her] in the back, and the children were in the back" Id. at 24. Instead, she "tried to transmit calm to [her] children." Id. at 29.

Silva called the police about 20 minutes after Guerrero took her SUV. See id. at 40. First, she called her husband, her mechanic, and talked to gas station employees. See id. at 37-4o.

## C. Audio Recording

During Silva's testimony, the government played an audio recording of the 911 call Silva placed from inside the gas station's store, about 20 minutes after the taking of the SUV. See id. at 26, 40. In the audio recording, Silva can be heard telling the 911 operator that "an individual held me up with the children and took my SUV." Exhibit 16 at 1. She says that the individual "stood at

the door ... and ... said: 'You have to get out with the children." Id. When asked whether the individual pulled out a weapon, Silva answered:

> No. No. No. He had – He said it was supposedly an order that they gave him. But they tell me here at the gas station that he's been going around for a while already, asking people for money. That they supposedly gave him an order that he has to take the SUV. That's what he told me. I stayed calm. I didn't want to argue ... Because I have two minors in the back seat.

Id. at 2.

## IV. DISCUSSION

The federal carjacking statute punishes "[w]hoever, *with the intent to cause death or serious bodily harm* takes a motor vehicle that has been transported, shipped, or received in interstate or foreign commerce from the person or presence of another by force and violence or by intimidation..." 18 U.S.C.A. § 2119. Today, the Court will focus on the afore-italicized intent element, which curbs § 2119's scope. See United States v. Diaz-Rosado, 857 F.3d 116, 125 (1st Cir. 2017) (Torruella, J, concurring). Guerrero contends the government did not prove it at trial.

To satisfy § 2119's specific intent element, the government must present evidence of a defendant's *mens rea* at the time of a vehicle's taking. Indeed, the government must show that a defendant possessed the intent to seriously harm or kill the victim when they demanded or took control of the victim's vehicle (even if they intended such harm only if necessary to complete the taking; the required intent can be conditional). See Diaz-Rosado, 857 F.3d at 121 (quoting Holloway v. United States, 526 U.S. 1, 12 (1999)). "If the defendant has the proscribed state of mind at that moment, the statute's scienter element is satisfied." Holloway, 526 U.S. at 8.

### A. Guns, Knives, and Baseball Bats...

The proof needed to sufficiently establish that a defendant intended to seriously harm or kill the victim (if necessary) varies from case to case. Generally, courts look objectively to the defendant's behavior and actions, as well as what the victim may reasonably gleam from those actions. See Ovalles v. United States, 905 F.3d 1300, 1303 (11th Cir. 2018). Proving intent, in most cases, is a cut-and-dried endeavor because the defendant utilized a loaded firearm to take the

vehicle. See Diaz-Rosado, 857 F.3d at 121; United States v. Garcia-Alvarez, 541 F.3d 8, 16 (1st Cir. 2008) (in addition to using a firearm, "assailants' violent assault left [victim] bleeding and requiring medical care and even surgery"); United States v. Matos-Quinones, 456 F.3d 14 (1st Cir. 2006); United States v. Lebron Cepeda, 324 F.3d 52, 57 (1st Cir. 2003); United States v. Evans-Garcia, 322 F.3d 110, 115 (1st Cir. 2003).[4] See also United States v. Edmond, 815 F.3d 1032 (6th Cir. 2016) ("The intent element of a carjacking offense is satisfied at a minimum if defendant brandishes a firearm and physically touches the carjacking victim."). In others, courts have upheld a finding of intent when the defendant carried, brandished or used a weapon such as a knife or a baseball bat (as well as any object that can be used to cut, stab, or bludgeon). See Diaz-Rosado, 857 F.3d at 127 (Torruella, J, concurring); United States v. Luan Van Nguyen, 566 F. App'x 322, 327 (5th Cir. 2014); United States v. Fekete, 535 F.3d 471, 480 (6th Cir. 2008). The rationale behind these rulings is simple: the fact that a defendant utilizes an operable weapon implies an intent, and even willingness, to use that weapon to cause death or serious bodily harm if necessary to take the victim's vehicle. But see United States v. Mack, 729 F.3d 594, 603–04 (6th Cir. 2013) ("The act of brandishing a firearm during a carjacking, without more, is not sufficient to prove specific intent to kill or cause serious bodily harm to the victim."). Even then, the use of a weapon must be taken in conjunction with other factors. See Edmond, 815 F.3d 1032. The matter is, however, less straightforward when the defendants carry an inoperable weapon such as an unloaded firearm,[5] or when, as here, they carry *no weapon at all*.

---

[4] See also United States v. Green, 664 F. App'x 193, 199–200 (3d Cir. 2016) (gun was used to pistol whip the victim); United States v. Lowe, 222 F. App'x 220, 224 (3d Cir. 2007); United States v. Augustin, 376 F.3d 135, 140 (3d Cir. 2004); United States v. Robinson, 855 F.3d 265, 269 (4th Cir. 2017); United States v. Frye, 489 F.3d 201, 207–08 (5th Cir. 2007); United States v. Casteel, 663 F.3d 1013, 1021–22 (8th Cir. 2011); United States v. Waldman, 310 F.3d 1074, 1079 (8th Cir. 2002); United States v. Reed, No. 18-11680, 2019 WL 2523483, at *4 (11th Cir. June 19, 2019).

[5] Several courts have held, or otherwise suggested, that an unloaded or inoperable gun cannot, by itself, constitute proof of intent. Thus, "if a defendant brandishes a firearm and (1) **physically touches** the carjacking victim, **or** (2) there is direct proof that **the firearm was loaded**, § 2119's specific intent element will be satisfied." United States v. Washington, 714 F.3d 962, 968 (6th Cir.2013) (emphasis ours).

Indeed, the First Circuit found intent in the case of a defendant brandishing an inoperable gun *only* because it considered that the defendant *did not know* the gun was inoperable. See United States v. Merced-Rodriguez, No. 07-1159, 2009 WL 750270, at *4 (1st Cir. Mar. 24, 2009) (finding intent even when gun had

## B. Brute Force

The mere absence of a weapon will not, by itself, impede a finding of intent. Undoubtedly, "[j]ust as one can use brute force or a variety of items to kill or cause serious harm, one can also use such force or items to manifest an intent to cause death or serious harm if necessary." Diaz-Rosado, 857 F.3d at 121. See also United States v. Rodriguez-Berrios, 573 F.3d 55, 66–67 (1st Cir. 2009) (finding intent where defendant was observed striking victim, car was later found ablaze in an abandoned field, and defendant's confession linked him to victim's murder); United States v. Carrasquillo-Carmona, No. CR 05-425 (JAG), 2007 WL 9711941, at *4 (D.P.R. Nov. 5, 2007) (finding intent where defendant hit the victim while demanding the vehicle be given to him).

Thus, the question now before the Court is whether Guerrero's behavior can support a finding of intent to cause death or serious bodily harm, when Guerrero was unarmed at the time of the SUV's taking.

In Diaz-Rosado, the First Circuit Court of Appeals held that the unarmed defendant in that case displayed the requisite *mens rea*, based on the following facts:

> We have at the outset a grandmother and her grandchild, with the latter sitting in a car seat inside a vehicle parked near an elementary school. A jury could certainly find that the grandmother would not have surrendered the vehicle with the child inside of it without offering maximum resistance. And [defendant] showed from the get-go that he was nevertheless prepared to overcome such resistance. He grabbed [victim's] hand, struggled with her, and pushed and shoved her. Eventually, according to [victim's] testimony, [defendant] threw her onto the cement sidewalk, at which point he was able to wrest loose her car key from her keychain. ... The record also shows that [defendant] put [victim's] vehicle into gear and began to move it while she was attempting to extricate the child from the car seat and [a third person] was struggling with [defendant] in the front seat.

---

a blocked barrel but there was no evidence to show that defendant knew the gun was inoperable). But see Merced-Rodriguez, 2009 WL 750270, at *5 (Torruella, J, dissenting) ("the fact that the gun was inoperable, that it was not used in the threat, and that Merced-Rodríguez ... fled upon hearing the victim scream ... indicate Merced-Rodríguez's total lack of intent to inflict serious bodily harm...")
 Similarly, the Seventh Circuit Court of Appeals has noted that, if a defendant ordered a carjacking victim to do as he was told or he would be shot, while carrying an unloaded gun, "the intimidation element would be satisfied but the intent element might not." United States v. Jones, 188 F.3d 773, 777 (7th Cir. 1999). See also Fekete, 535 F.3d at 82; United States v. Malone, 222 F.3d 1286, 1291 (10th Cir. 2000).

857 F.3d at 121–22. The Diaz-Rosado Court centered its analysis on three factors. First, the defendant used violence from the outset of the encounter. See id. at 122 (quoting United States v. Rodríguez-Adorno, 695 F.3d 32, 42 (1st Cir. 2012)). See also Garcia-Alvarez, 514 F.3d at 16. Second, the defendant "initiated the heist in circumstances where it was virtually certain that violence would be necessary." Diaz-Rosado, 857 F.3d at 122. Finally, and "crucially," defendant employed "whatever force was necessary to accomplish his aim" at "each juncture of the incident." Id. As the Court noted, the force "progressed from pushing and pulling, to a body slam, to intentionally moving the vehicle … to separate a desperately resistant grandmother from the car containing her grandchild …" Id.[6]

At least two of these factors are entirely absent in the above-captioned case.[7] Guerrero did not use violence or employ force against Silva – in fact, he did not touch her at all. Indeed, this last detail is crucial to the inquiry at hand – every single case the Court has found involving an unarmed defendant in which the evidence was deemed sufficient to support a finding of intent entailed some degree of forceful physical contact. See Diaz-Rosado, 857 F.3d at 121-22; Rodriguez-Berrios, 573 F.3d at 66 (defendant was seen striking victim); United States v. Hayworth, 682 F. App'x 369, 372 (6th Cir. 2017) (defendant "struck and struggled with a nine-months pregnant woman, who had already fallen to the ground, until she relinquished her keys"); Edmond, 815 F.3d at 1040 (defendant wrestled keys from valet after a struggle); United States v. Samarah, 203 F. App'x 156, 157–58 (9th Cir. 2006) (defendant "kicked and hit the victim with enough force to knock him to the ground and render him dazed"); Carrasquillo-Carmona, 2007 WL 9711941, at *4 (defendant hit the victim). Cf. United States v. Wright, 246 F.3d 1123, 1127–28 (8th Cir. 2001) (defendant "shifted

---

[6] Even with all three factors weighing against the defendant, **the Diaz-Rosado Court still noted that "the case [was] close."** Id. at 121. Relevantly, the concurring opinion cautioned that "certain forms of physical struggle, while not necessarily indicating an empty threat or bluff, may still not rise to the level of threatening serious bodily harm," and warned that "[Diaz-Rosado] should not be read to indicate … that we are lowering the threshold required to find specific intent." Id. at 127-28 (Torruella, J., concurring).

[7] While Guerrero also approached a vehicle that contained children, this Court does not agree that violence was "virtually certain." In fact, no acts of violence occurred during the taking of Silva's SUV.

[vehicle] into drive, pulled the car forward, brought it to a stop for an instant, and hit the gas again, directing the [vehicle] at [victim] with sufficient force to send [victim] up onto the hood"). The case now before the Court stands in stark contrast.

## C. **Five Factors "For" and Reasonable Conclusions**

Notwithstanding, the government argues that Guerrero's specific intent to seriously harm or kill can be inferred from five factors: (1) Guerrero's size as compared to Silva's, (2) that Guerrero, rather than his smaller codefendant, approached Silva and took the SUV, (3) that Guerrero arrived on foot at the gas station, (4) that Guerrero kept Silva close at all times and followed her around the vehicle, and (5) what Guerrero said to Silva. See Docket No. 137 at 10-11. However, even viewing these five factors "in the light most flattering to the jury's guilty verdict," the Court cannot find that "a reasonable factfinder could have concluded that the defendant was guilty beyond a reasonable doubt." Lipscomb, 539 F.3d at 40. To boot, and damningly, the government cites no caselaw that demonstrates how these factors can be taken to prove Guerrero's specific intent. If Diaz-Rosado was "a close call," 857 F.3d at 121, the case at hand is a ten-mile long shot.

### 1. *Guerrero's Size*

Guerrero is a large individual, in fact much larger than Silva, but that does not by itself (nor in conjunction with the other factors the government proposes) indicate that he intended to seriously harm or kill her.[8] The Court refuses to criminalize a defendant's heft and tall stature. An argument to that effect is no more than an off-the-cuff, desperate Hail Mary attempt.

### 2. *Using Guerrero*

The fact that Guerrero, rather than his smaller codefendant, carried out the taking carries more weight, but not enough. It evinces what a jury might reasonably construe as a deliberate choice to use a larger individual because he will likely be more menacing to the victim, and thus

---

[8] Perhaps paradoxically, the opposite proposition could hold more water. A smaller carjacker may be likelier to necessitate violence to obtain a victim's compliance. Cf. Quinata v. Zavislan, No. 3:17-CV-5268 RBL-TLF, 2017 WL 6375966, at *5 (W.D. Wash. Nov. 3, 2017) (finding sufficient evidence of intent to seriously injure when jury heard proof that a 5'1 female defendant stabbed a 5'7 male victim).

more likely to succeed. Undoubtedly, a commanding stature can amplify and lend credibility to a threat. See United States v. Holmes, 387 F. App'x 242, 245 (3d Cir. 2010). However, a reasonable factfinder cannot conclude that choosing to send a larger individual sufficiently proves, beyond a reasonable doubt, the conditional intent to seriously harm or kill the victim.[9]

### 3. Arrival on Foot

Similarly, the fact that Guerrero arrived on foot sufficiently establishes just one thing: he did not have a car before taking Silva's. To be sure, the government's conjectural assumption that, because Guerrero was on foot, "if the victim resisted, screamed or tried to call the police, he would need a car to flee and would be unable to abandon the carjacking without the use of force" is nothing short of impermissible speculation. See United States v. Ofray-Campos, 534 F.3d 1, 31–32 (1st Cir. 2008). A car is not a prerequisite to abandoning the scene of a botched crime – criminals often flee on foot.

### 4. Following Silva and Keeping her Close

The fourth factor is belied by the record. Even viewing the "evidence in the light most flattering to the jury's guilty verdict," Lipscomb, 539 F.3d at 40, the government's proposition that Guerrero followed Silva around the vehicle and kept her close at *all* times is false. Guerrero does not follow Silva around the vehicle, nor does he always keep her close. He lingers before following her to the rear of the vehicle, where he stands to the side. When Silva walks to the front passenger seat, Guerrero stays behind the trunk and then moves to the *opposite* side of the vehicle. In fact, Silva mostly moves around the SUV freely, and Guerrero does nothing to impede or rush her. The only points when Guerrero is particularly close to Silva are at the beginning of the taking, when Guerrero approaches the driver's door and corners Silva as he demands the SUV,[10] and when they are both at the trunk of the car removing items from within. To be sure, the fact that Guerrero cornered Silva at the inception of the taking is highly relevant to the inquiry at hand, but the

---

[9] Notwithstanding, Guerrero's size will be relevant later on when discussing his threat to Silva.
[10] Guerrero's proximity to Silva at the beginning of the carjacking will also be discussed later.

evidence conclusively demonstrates that Guerrero neither followed Silva around the vehicle nor kept in constant physical proximity to her throughout the taking.

   *5. The Threat*

The remaining factor also lands wide of the fairway. Once Guerrero had approached the SUV's driver door, he told Silva "that if [she] cooperate[d], he [was] not going to harm either [her] nor [her] children." Trial Transcript, Day 2, at 20. He simultaneously touched his t-shirt, as if "making [Silva] understand that he was armed." Id. at 21. See also id. at 28, 46.

The government posits that Guerrero's threat to Silva is enough to find specific intent (in conjunction with the other four aforementioned factors). But, "while an empty threat, or intimidating bluff, would be sufficient to satisfy [§ 2119's intimidation] element, such conduct, standing on its own, is not enough to satisfy § 2119's specific intent element." Holloway, 526 U.S. at 11–12. To determine whether a threat is empty, or the defendant in fact intended to follow through (if necessary), courts consider the "actor's visible conduct and what the victim might reasonably conclude." Ovalles, 905 F.3d at 1303.

To be sure, Guerrero's size had the effect of making his threat more credible to Silva – she testified at trial that she felt intimidated by his heft and stature. It is also relevant that Guerrero cornered Silva at the front door and temporarily blocked her from exiting the SUV. *But, he did not touch or physically restrain her, nor did he apply even a modicum of force.* [11] Thus, Guerrero's conduct does not evince a willingness to use his size for anything other than posturing in a menacing way.

Furthermore, the fact that Guerrero touched his t-shirt in a manner that signaled he was armed weighs against an inference that he intended to use brute force to harm or kill Silva, if necessary to take the vehicle. Had Guerrero intended to use brute force, he would have framed his

---

   [11] Again, the Court has found no cases where a weaponless defendant has been found to possess the intent to seriously harm or kill absent some degree of physical touching or the exertion of force. See Discussion in subsection B: "Brute Force," pgs. 8-10, *supra*.

threat in that fashion. *But, instead, Guerrero relied on faking he had a gun to obtain Silva's compliance.* **That is a textbook bluff**. See United States v. Bailey, 819 F.3d 92, 97 (4th Cir. 2016) ("a rational trier of fact could only conclude that [unarmed defendant], in holding a "cold and hard" object to [victim's] neck and ordering [victim] to drive, at most ... engaged in an empty threat or an intimidating bluff in hopes of coercing [victim]...").

While a victim's perception is usually instructive as to a perpetrator's intent, Silva's fear does not affect this Court's analysis. See id. at 98 fn. 4.[12] An empty threat delivered in a convincing manner will typically instill fear in its recipient. Still, the recipient's distress does nothing to transform the threat itself. To be sure, an empty threat's success in achieving its intended purpose – scaring the recipient into compliance – does not suddenly imbue its issuer with an actual intent to injure, maim or kill. Put simply, an empty threat is *empty* a reason.

As such, there is no evidence in the record from which a jury could reasonably conclude that Guerrero harbored the intent to follow through on his threat, and harm or kill Silva, if necessary to take the SUV.

*6. Reasonable Conclusions*

In fact, this Court holds that no reasonable fact trier could conclude that Guerrero held the intent to seriously harm or kill, if necessary to take the Silva's SUV. The evidence presented at trial tells the story of an unarmed defendant who takes a victim's vehicle after delivering an empty threat and bluffing he is carrying a weapon. He does not employ any form of force against the victim and does not even touch her. He allows her substantial time to remove her belongings from the vehicle

---

[12] The Bailey Court criticized the district court decision in that case for focusing too much on the victim's fear, noting that:
> on an appropriate evidentiary foundation, apart from a perpetrator's actual conduct (obviously), evidence of a victim's subjective reaction to a perpetrator's conduct and/or evidence of objective manifestations of a victim's state of mind, might well be probative of a perpetrator's specific intent to harm or kill. This plainly is not such a case. Surely, virtually any robbery victim ... will be intimidated and frightened and will look to escape his predicament at the earliest opportunity. Holloway [, 526 U.S. 1,] requires more, however, to prove the specific intent element of the federal offense of carjacking under § 2119.

and does not rush or threaten her as she does so. In fact, he helps her. This factual background does not comport with any case in which § 2119's intent element has been satisfied. See Diaz-Rosado, 857 F.3d at 121-22; Rodriguez-Berrios, 573 F.3d at 66; Hayworth, 682 F. App'x at 372; Edmond, 815 F.3d at 1040; Samarah, 203 F. App'x at 157–58; Carrasquillo-Carmona, 2007 WL 9711941, at *4; Wright, 246 F.3d at 1127–28. The evidence here is not sufficient for a reasonable factfinder to conclude that Guerrero possessed the requisite *mens rea.* As such, Guerrero's Rule 29 motion must be granted.

The record before the Court reflects that Guerrero is a criminal who should reap what he has sowed. But, for Guerrero to be convicted, he must be prosecuted for the *right crime*, and *all elements* of that crime must be proven. As it stands, Guerrero did not violate § 2119. His conviction pursuant to that statute cannot pass muster.

## D. **Death or Serious Bodily Harm**

The federal carjacking statute does not punish a defendant who intends to cause any degree of harm. The application of § 2119 is reserved for defendants who intend to cause death or *serious bodily harm.* The "level of harm contemplated ... is significant and requires more than simply injuring or threatening to injure the victim." Diaz-Rosado, 857 F.3d at 126 (Torruella, J, concurring). Indeed, the defendant must intend "to cause something equivalent to 'extreme physical pain,' 'protracted and obvious disfigurement,' or 'protracted loss or impairment of the function of a bodily member, organ or mental faculty.'" Id. (quoting 18 U.S.C. § 1365(h)(3)). To be sure, "certain forms of physical struggle, while not necessarily indicating an empty threat or bluff, may still not rise to the level of threatening serious bodily harm..." Id. at 127-28.

Even if a reasonable trier of fact could determine, from the evidence presented at trial, that Guerrero intended to harm Silva, nothing in the record suggests that such harm would rise to the level of harm required by the federal carjacking statute – that is, *death or serious bodily harm*.

## V. <u>CONCLUSION</u>

For the reasons specified above, Guerrero's motion for judgment of acquittal is **GRANTED**. Judgment will be entered forthwith.

**IT IS SO ORDERED**.

In San Juan, Puerto Rico, November 6, 2019.

<u>S/ JUAN M. PÉREZ-GIMÉNEZ</u>
**JUAN M. PÉREZ-GIMÉNEZ**
**SENIOR U.S. DISTRICT JUDGE**
